672 A.2d 769

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Danny MATOS, Appellant.**

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Andrew McFADDEN, Appellant.**

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Richard CARROLL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 1994.

Decided Feb. 26, 1996.

John W. Packel, Helen A. Marino, Philadelphia, for D. Matos, R. Carroll.

Catherine Marshall, Ronald Eisenberg, Hugh J. Burns, Philadelphia, for Commonwealth.

John W. Packel, Ellen T. Greenlee, Helen A. Marino, Philadelphia, for A. McFadden.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## *MAJORITY OPINION*

CAPPY, Justice.[1]

The three instant appeals were consolidated for oral argument and will be disposed of together in this opinion since they raise a single identical issue; namely, whether contraband discarded by a person fleeing a police officer are the fruits of an illegal "seizure" where the officer possessed neither "probable cause" to arrest the individual nor reasonable suspicion to stop the individual and conduct a *Terry* frisk.[2] In each case, we reverse the Superior Court and hold that the discarded contraband must be suppressed.

The relevant facts of each case shall be set forth briefly.

### *Matos v. Commonwealth, J–198A*

In this case, on April 8, 1991, two Philadelphia police officers responded to a radio broadcast that unknown persons were selling narcotics in the vicinity of Reese Street. They approached a group of three men in a nearby playground who fled as the officers approached. During the ensuing chase, one of the officers saw Appellant Matos discard a plastic bag. The officer retrieved the bag. Matos was then apprehended and the bag was discovered to have contained 12 vials of

---

1. This opinion was reassigned to this author.

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

cocaine. Five additional vials of cocaine were found in Matos pocket after he was seized by the officer. The Court of Common Pleas of Philadelphia County suppressed the introduction of the vials of cocaine at Matos' trial on drug charges, but the Superior Court reversed.

### McFadden v. Commonwealth, J–198B

On October 27, 1990, two Philadelphia police officers in full uniform and in a marked patrol car approached Appellant McFadden, who looked in their direction and promptly ran away. One of the officers chased him for a short distance and, before being caught, McFadden tossed a handgun into the bushes. He was subsequently arrested after the gun was recovered and charged with carrying an unlicensed firearm on a public street. The Court of Common Pleas of Philadelphia County suppressed the evidence of the handgun at trial, but the Superior Court reversed.

### Carroll v. Commonwealth, J–198C

On November 22, 1989, two uniformed Philadelphia police officers in a marked police vehicle saw two men standing on the sidewalk of Olive Street. Both officers exited their patrol car and one of the officers spoke to one of the two men. The second man, Appellant Carroll, stood with his hands in his jacket pockets. The other officer, with his hand over his gun, approached Carroll and started to ask him to take his hands out of his pockets. Carroll turned and fled into an alley, where he promptly slipped and fell on some debris. As he fell, he was being followed by one of the officers, who saw two broken tinted heat sealed packets containing a white substance fall from Carroll's pocket onto the debris in the alley. The pursuing officer approached Carroll, who was still face down in the debris, drew his gun, and told Carroll to stay on the ground with his hands behind his back. Carroll was then arrested. The officer searched Carroll's coat pockets and found 45 additional brown tinted packets. At his trial for possession of drugs and possession of drugs with intent to deliver, the Court of Common Pleas of Philadelphia sup-

pressed the evidence of the drugs, but the Superior Court reversed.

## DISCUSSION

 The issue in each of these cases is whether the pursuit by the police officer was a seizure. If it was not a seizure then the contraband was abandoned property, lawfully found by the officer. However, if the pursuit was a seizure, then the abandonment was coerced, and the officer must demonstrate either probable cause to make the seizure or a reasonable suspicion to stop and frisk.

Appellants herein concede that under Fourth Amendment principles as set forth in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a seizure did not occur. Appellants assert, however, that under Article I, Section 8 of the Pennsylvania Constitution a seizure did occur. Accordingly, we must now determine if Pennsylvania should adopt the reasoning expressed by the United States Supreme Court in *Hodari D.*, or continue to interpret our State Constitution as affording a suspect a greater degree of protection from coercive state action.

Before beginning our review under the Pennsylvania Constitution, we will look at the specifics of the decision in *Hodari D.* In *Hodari D.*, two police officers (identified by their jackets as police) were patrolling in an unmarked car in a high crime area. They approached a group of youths who fled. The accused youth discarded what appeared to be a small rock before he was tackled and handcuffed by one of the police officers. The "rock" turned out to be crack cocaine. In a 7–2 decision, Justice Scalia held that even if (as was conceded by the State of California) the officers' pursuit had not been based upon reasonable suspicion, the drugs discarded were not the illegal fruit of a "seizure" of his person under the Fourth Amendment. The majority based this conclusion upon its reasoning that an arrest (the quintessential "seizure" of a person under the Fourth Amendment) requires either the application of physical force with lawful authority or submission to the assertion of authority and, under the facts of

*Hodari D.*, the accused had not been touched by the pursuing officer at the time he discarded the drugs. Moreover, assuming that the police officers' pursuit constituted a show of authority enjoining the accused to halt, the accused did not comply and therefore was not "seized" until one of the officers tackled him. In passing, Justice Scalia clearly notes that the State of California conceded that the police in *Hodari D.* did not even have "reasonable suspicion" to stop the accused under *Terry*, let alone probable cause to arrest.

As we stated in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), "we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions." 526 Pa. at 388, 586 A.2d at 894. Rather,

it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they "are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees," [citations omitted] we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

526 Pa. at 389, 586 A.2d at 894–895. We find it most instructive to continue our analysis of the seizure question raised herein in accordance with the four-pronged test set forth in *Edmunds*.[3]

3. In *Edmunds,* this Court created a four-pronged methodology to aid in the analysis of state constitutional claims. This methodology, while not mandatory, highlights important touchstones that should be considered whenever this Court weighs the impact of United States Constitutional decisions upon state constitutional claims. The four factors to be considered are:

 1) The text of the Pennsylvania Constitutional provision;

 2) The history of the provision, including Pennsylvania case law.

 3) Related case law from other states; and,

 4) Policy considerations unique to Pennsylvania. *Edmunds,* 526 Pa. at 391, 586 A.2d at 895.

The first two prongs of the *Edmunds* test require us to examine the text of the constitutional article and its historical application. Although the language of Article I, Section 8 is essentially the same as that in the Fourth Amendment,[4] as this Court stated in *Edmunds*:

> Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution [footnote omitted], we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical [citation omitted]. Thus, we must next examine the history of Article I, Section 8, in order to draw meaning from that provision ...

526 Pa. at 391–392, 586 A.2d at 896. Our review of the historical context and application of Article I, Section 8 reveals that this Court has traditionally regarded Article I, Section 8 as providing different, and broader, protections than its federal counterpart.

In *Edmunds*, this Court thoroughly examined the history of Article I, Section 8, and noted that this constitutional provision had its origin *prior* to the Fourth Amendment, in Clause 10 of the original Constitution of 1776. The Court also recognized that the modern version of Article I, Section 8 has remained untouched for over 200 years, and examined this significance:

> [T]he survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776

---

4. Article I, Section 8 provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Amendment Four provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

continues to enjoy the mandate of the people of this Commonwealth.

526 Pa. at 394, 586 A.2d at 897, citing *Commonwealth v. Sell,* 504 Pa. 46, 65, 470 A.2d 457, 467 (1983). In *Edmunds,* the Court reviewed the history of Article I, Section 8 to determine whether the "good faith" exception to the exclusionary rule was consistent with the protections afforded by Article I, Section 8. After its review of the development of Article I, Section 8, the Court stated:

> The history of Article I, Section 8, thus indicated that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the Fourth Amendment, as articulated by the majority in [*United States v.] Leon,* [468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ].

526 Pa. at 394, 586 A.2d at 897. "[A]s this Court has stated repeatedly in interpreting Article I, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Id.* The Court then concluded that the purpose of the exclusionary rule as developed in Pennsylvania was not solely to deter police conduct, as the United States Supreme Court had interpreted it, but rather was **"unshakably linked to a right of privacy in this Commonwealth."** 526 Pa. at 397, 586 A.2d at 898 [emphasis added].

The issue in *Edmunds,* of course, was whether the "good faith" exception to the exclusionary rule would frustrate the guarantees embodied in Article I, Section 8, whereas in the cases *sub judice* we are questioning whether an individual is improperly seized for purposes of Article I, Section 8 when the police without probable cause or reasonable suspicion pursue a citizen, thus requiring any abandoned contraband to be suppressed. Nevertheless, our pronouncement that Article I, Section 8 incorporates a strong right of privacy would not be any less applicable to the issue here. Certainly, the rights of individuals in this Commonwealth to be free from intrusive conduct by the police is implicated when the police pursue an

individual, absent reasonable suspicion or probable cause, as it is when they execute a search warrant without probable cause.

The second prong of *Edmunds* also requires a review of the development of Pennsylvania case law in relation to the section of our State Constitution at issue. In this regard the law of this Commonwealth has always maintained a strong preference for the rights of the individual in the face of coercive state action. Through our decisions in *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969), *Commonwealth v. Jeffries*, 454 Pa. 320, 311 A.2d 914 (1973), *Commonwealth v. Jones*, 474 Pa. 364, 378 A.2d 835 (1977), and *Commonwealth v. Barnett*, 484 Pa. 211, 398 A.2d 1019 (1979), this Court, both in coordination with and independent of the federal courts, has set forth the standards to be applied in determining whether an individual is seized and whether the seizure is lawful; and if it is not lawful, whether any evidence obtained must be suppressed.

In *Hicks*, this Court adopted the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which permits a police officer to effect a precautionary seizure where the police have a reasonable suspicion that criminal activity is afoot. 434 Pa. at 158–159, 253 A.2d at 279–280. *Terry*, and by analogy *Hicks*, recognized that there are some instances in which an individual may not be arrested, but will still be considered to be "seized." 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 889. In *Jones*, this Court adopted an objective standard for determining what amount of force constitutes the initiation of a *Terry* stop: "whether a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." 474 Pa. at 373, 378 A.2d at 840. This case, which *preceded* the United States Supreme Court's decision in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), was a precursor to the so-called "*Mendenhall*" test posited by the United States Supreme Court: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would

458

have believed he was not free to leave." 446 U.S. at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

The *Jones/Mendenhall* standard has since been consistently followed in Pennsylvania in determining whether the conduct of the police amounts to a seizure or whether there is simply a mere encounter between citizen and police officer. *See e.g., Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983); *Commonwealth v. Hall,* 475 Pa. 482, 380 A.2d 1238 (1977); *Commonwealth v. Brown,* 388 Pa.Super. 187, 565 A.2d 177 (1989); *Commonwealth v. Bulling,* 331 Pa.Super. 84, 480 A.2d 254 (1984). *Commonwealth v. Carroll,* 427 Pa.Super. 1, 628 A.2d 398 (1993) (Johnson, J., dissenting). *See also Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994). Additionally, a brief survey through West's Pennsylvania Digest 2d reveals scores of cases in Pennsylvania in which the issue of seizure is determined by the *Jones/Mendenhall* test.

This Court has also specifically addressed the issue of "coercive" stops. In *Commonwealth v. Jeffries, supra,* a case factually indistinct from the cases *sub judice,*[5] this Court held that when the police had neither probable cause nor reasonable suspicion to justify a seizure, the action of the police in chasing an individual and subsequently arresting him was a violation of his Fourth Amendment rights. 454 Pa. at 325–326, 311 A.2d at 917. The Court applied the exclusionary rule and held that the abandoned contraband must be suppressed because "[t]he causative factor in the abandonment ... was the unlawful and coercive action of the police in chasing Jeffries in order to seize him ..." 454 Pa. at 327, 311 A.2d at 918. Thus, the Court found both that Jeffries had been seized by the conduct of the police in chasing him, and that the contraband abandoned by Jeffries must be suppressed. This Court again exhibited its concern for coercive conduct by the police in *Barnett,* another case factually similar to *Jeffries* and

5. In *Jeffries,* Jeffries was walking along a public street when he noticed four police officers. Jeffries quickened his pace, prompting the police officers to leave their police car. Jeffries then began to run, and the police officers gave chase. Jeffries abandoned a cigarette packet, containing drugs, during the chase.

the instant cases.[6] In *Barnett,* the Court upheld a suppression order stating:

> Under these circumstances, the suppression court was correct in finding that the officers did more than merely approach appellee for questioning. The police conduct here amounted to a coercive factor which was the main reason that appellee abandoned the weapon.

484 Pa. at 216, 398 A.2d at 1019.

Both *Jeffries* and *Barnett* exhibit a concern for protecting individuals against coercive police conduct. Moreover, both cases take a *reasonable* and *objective* approach to determining whether, in fact, the subject being pursued felt free to leave and was therefore seized by the conduct of the police.

 ▮ Thus, there exists clear precedent in Pennsylvania defining the appropriate standards to be used when considering whether an individual has been seized. The long-standing definition of what constitutes a seizure applied by the Courts of this Commonwealth cannot be ignored, particularly when viewed in tandem with this Court's recognition of the privacy rights embodied in Article I, Section 8.[7]

Next, we turn to the holdings of our sister states which have considered the United States Supreme Court's decision in *Hodari D.* Under the *Edmunds* analysis, we do not look merely to the number of states deciding an issue one way or

---

6. In *Barnett,* officers observed Barnett walking down the street with his hands in his pockets. When Barnett noticed the police officers, he ducked behind a parked car. The officers then stopped the car, whereupon Barnett ran. The officers chased Barnett, who discarded a pistol and ammunition during the pursuit.

7. We do not find that because these cases were decided to some degree by reliance upon the federal Fourth Amendment that they are not representative of the law of this Commonwealth pertaining to Article I, Section 8. At best, nothing can be discerned from the Court's failure to note specifically that Pennsylvania Constitutional rights were also being considered. The federal Constitution provides a *minimum* of rights below which the states cannot go. *Commonwealth v. Sell,* 504 Pa. 46 at 63, 470 A.2d 457 at 467. Where our Court, as in *Jeffries,* finds that the police violated the defendant's federal constitutional rights, there is no reason for the Court to go further and address what additional protections the Pennsylvania Constitution might also provide.

another; rather, we look to the substance of those decisions to see if we can glean whether those states finding greater protection under their states' constitutions espouse constitutional concerns similar to ours. It is also instructive to determine why other states reject providing broader protection.

Several states have recognized that privacy rights are implicated by their states' constitutional equivalent to the Fourth Amendment and have shown a reluctance to abruptly abandon the protections their citizens have enjoyed under their state constitutions. *See, e.g., State v. Tucker,* 136 N.J. 158, 642 A.2d 401 (1994); *In re E.D.J.,* 502 N.W.2d 779 (Minn.1993); *New York v. Madera,* 153 Misc.2d 366, 580 N.Y.S.2d 984 (Supreme Ct.1992), *aff'd* 189 A.D.2d 462, 596 N.Y.S.2d 766, *aff'd* 82 N.Y.2d 775, 624 N.E.2d 675, 604 N.Y.S.2d 538 (1993); *State v. Oquendo,* 223 Conn. 635, 613 A.2d 1300 (1992); *State v. Quino,* 74 Haw. 161, 840 P.2d 358 (1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1992); *State v. Holmes,* 311 Or. 400, 813 P.2d 28 (1991). The conclusion of these state courts that they are reluctant to depart from the long-recognized *Mendenhall* test should not be taken lightly. These decisions are well-considered and clearly evidence a recognition by the courts that the citizens of their states are entitled to broader privacy rights under their state constitutions. Moreover, several states that have adopted *Hodari D.* do so noting that they do not have a history of providing greater protection to their citizens or recognizing a privacy interest. *See, e.g., State v. Agundis,* 127 Idaho 587, 903 P.2d 752 (1995); *Johnson v. State,* 864 S.W.2d 708 (Tex.App.1993); *State v. Cronin,* 2 Neb.App. 368, 509 N.W.2d 673, 676 (1993) ("Nebraska has neither an explicit constitutional right of privacy nor a history of affording individuals greater rights than are afforded by the federal Constitution"); *Henderson v. Maryland,* 89 Md.App. 19, 597 A.2d 486 (1991)

This Court has clearly and emphatically recognized that our citizens enjoy a strong right of privacy, and that our citizens are therefore entitled to broader protection in certain circumstances under our state constitution. *See, e.g., Edmunds,*

*supra; Commonwealth v. Mason,* 535 Pa. 560, 637 A.2d 251 (1993); *Commonwealth v. Martin,* 534 Pa. 136, 626 A.2d 556 (1993); *Commonwealth v. Rodriquez,* 532 Pa. 62, 614 A.2d 1378 (1992). Thus, our historical development of case law under Article I, Section 8 is more consistent with the rationale of the state courts that have found broader state constitutional protections.

■ The fourth prong of *Edmunds* requires us to consider the policy considerations involved in accepting federal precedent in the context of a claim made under the Pennsylvania Constitution. It has long been the rule in Pennsylvania that an individual has no duty to stop or respond to an inquiry by the police. Although the police may initiate an encounter with a suspect, and request information absent any level of suspicion, that encounter **"carries no official compulsion to stop or respond."** *Commonwealth v. Douglass,* 372 Pa.Super. 227, 228–229, 539 A.2d 412, 417–18 (1988), *allocatur denied,* 520 Pa. 595, 552 A.2d 250 (1988) [emphasis added].

Less than three years ago, this Court, in *Commonwealth v. Rodriquez, supra,* rejected the contention that the goal of curtailing the drug trade permits the expansion of police intrusion without the constitutional justification of reasonable suspicion or probable cause:

> We emphatically reject the Superior Court's "end justifies the means" analysis. By focusing its attention only upon the serious ills inflicted upon society by illegal narcotics, the Superior Court failed to recognize and respond to necessary constitutional constraints on excessive police conduct. The seriousness of criminal activity under investigation, whether it is the sale of drugs or the commission of a violent crime, can never be used as justification for ignoring or abandoning the constitutional right of every individual in this Commonwealth to be free from intrusions upon his or her personal liberty absent probable cause.

> Accordingly, we decline to adopt the rationale of the Superior Court or the arguments offered by the Commonwealth, and thus, we decline to expand the appropriately narrow

"reasonable suspicion" exception to probable cause already established by the United States Supreme Court in *Terry v. Ohio* and by this Court in *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969).

532 Pa. at 73, 614 A.2d at 1383. As we declined to expand the reasonable suspicion exception in *Rodriquez* as contrary to the protections afforded by Article I, Section 8, so too does this Court decline to narrow the long-recognized definition of seizure by adopting the *Hodari D.* definition.

Thus, we find that there are ample policy reasons to reject the decision of the United States Supreme Court in *Hodari D.* as being inconsistent with the constitutional protections afforded under Article I, Section 8 of the Pennsylvania Constitution. As aptly put by Justices Stevens and Marshall, "[i]f carried to its logical conclusion, it will encourage unlawful displays of force that will frighten countless citizens into surrendering whatever privacy rights they may still have." 499 U.S. at 646–647, 111 S.Ct. at 1561, 113 L.Ed.2d at 710 (Stevens, J., dissenting).

Accordingly, we reject *Hodari D.* as incompatible with the privacy rights guaranteed to the citizens of this Commonwealth under Article I, Section 8 of the Pennsylvania Constitution. The order of the Superior Court is reversed and the cases are remanded to the respective trial courts for further disposition in accordance with this opinion.

PAPADAKOS and MONTEMURO, JJ., did not participate in the decision of this case.

CASTILLE, J., files a dissenting opinion.

CASTILLE, Justice, dissenting.

The majority opinion here holds that police officers, in the exercise of their duty cannot, and in reality, shall not, observe the behavior of certain individuals and during the course of that observation attempt to ascertain whether or not criminal conduct is afoot by merely approaching an individual on a public street without subjecting evidence abandoned thereby to suppression.

This is a radical departure from what has long been the reasoned policy of this Commonwealth. Perhaps the majority fears that the mere approach of an individual by an investigating police officer and the subsequent following of that individual by the officer when the individual takes flight somehow places the Commonwealth at the top of a slippery slope leading inexorably to a police state or to the quartering of troops in private homes or even to the rebirth of writs of attainder. Rather, in this Commonwealth we have adopted and this Court has, in the past, adequately protected the delicate balance of the interests of the citizenry. Our citizens have an absolute interest in preserving their right to be free from unwarranted intrusion by police officers. But our citizens also have the competing right to be free from those who roam the streets, destroy the neighborhood and threaten the fabric of our lives and the public safety with contraband and weapons on public streets and byways.

The majority's holding now requires our police to determine with absolute certainty that criminal activity is afoot, that a person is armed, or that a person has committed a given crime before police officers may pursue that person in any manner, be it by foot, by vehicle, by observation from afar or by merely asking questions of that person on the street. Clearly, law enforcement efforts will be greatly hampered since police officers under this decision are left with little authority to pursue, follow, or even approach and ask questions of suspects absent probable cause or reasonable suspicion to do so.

In the matters *sub judice*, I believe that the police officers' approach and pursuit of appellants were not seizures under any common sense or legal meaning of the word, nor was police conduct a show of authority and, therefore, the contraband seized constituted abandoned property lawfully obtained by the police officers. For the following reasons, I would find that such seizure of discarded property does not violate either the Fourth Amendment to the United States Constitution or its Pennsylvania Constitutional equivalent and, therefore, was admissible at trial.

## *Discussion*

### A. *Fourth Amendment*

The seminal question before this Court is whether the police officers' mere approach and subsequent pursuit of the appellants in the aforementioned matters constitutes a "seizure" which invokes the protections of the Federal and Pennsylvania constitutions. Clearly, the protections of the United States Constitution are not invoked. The United States Supreme Court recently examined the parameters of what constitutes a seizure under the Fourth Amendment in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Under *Hodari D.*, that Court held that a seizure did not occur where police officers chased a suspect, even where it was conceded that they had no probable cause or even reasonable suspicion to do so. Therefore, since such a pursuit did not constitute a seizure under the Fourth Amendment of the United States Constitution, the Supreme Court held that the evidence discarded by Hodari D. during the chase was not the fruit of an illegal seizure which would warrant suppression of the evidence.

A summary of the evidence in *Hodari D.* is that two police officers wearing jackets with a "Police" emblem on the back were patrolling in an unmarked car in a high-crime area. As they drove towards a group of youths, the youths looked in the officers' direction and immediately fled. The officers exited their car and pursued the youths to investigate. While Hodari D. ran, he discarded what the pursuing officer believed to be a small rock. After seeing the rock discarded, the officer tackled Hodari D. and handcuffed him. At trial, the prosecution established that the "rock" that was discarded was crack cocaine.

Upon appeal, the United States Supreme Court held that regardless of whether the police had reasonable suspicion or probable cause to pursue Hodari D., the item Hodari D. discarded was not the fruit of an illegal "seizure" of his person under the Fourth Amendment. In arriving at its conclusion, the Court held that under the Fourth Amendment a seizure does not occur unless the police either apply physical force

with lawful authority, or the suspect submits to the assertion of police authority. Since at the time Hodari D. discarded the evidence that was later used against him, police had neither physically touched nor restrained him, and Hodari D. had not submitted to any assertion of police authority (e.g. by stopping), the Court found that no seizure had occurred. Rather, a seizure was found only to have occurred at the moment the pursuing officer physically tackled the youth. Hence, because the illegal contraband was discarded before any police seizure occurred, the Court considered it voluntarily abandoned and, therefore, admissible evidence.

Given the similarities between *Hodari D.* and the instant three cases, it is clear that the officers' pursuit of appellants in the instant cases did not constitute seizures under the Fourth Amendment. Here, at the time appellants discarded their respective contraband, the police officers had not physically touched or restrained them and the appellants had not submitted to the police officers' assertion of authority. Rather, appellants, of their own volition, fled from the police officers upon merely observing the officers approach their location. Hence, there was no seizure which had occurred at the time appellants discarded the illegal contraband during flight. A seizure occurred only at the time the police officers physically restrained appellants. Thus, under the United States Constitution and *Hodari D.*, appellants' federal Fourth Amendment rights were not violated and the evidence was properly admissible. *Hodari D., supra.*[1]

## B. *Article 1, Section 8 of the Pennsylvania Constitution*

Notwithstanding that the pursuit of appellants by the police did not constitute a seizure in terms of the Fourth Amend-

1. The suppression courts below each relied on this Court's opinion in *Commonwealth v. Jeffries*, 454 Pa. 320, 311 A.2d 914 (1973), to hold that the evidence seized from the appellants in these cases was inadmissible. In *Jeffries*, this Court determined that the Fourth Amendment prevented a police officer from pursuing Jeffries when that police officer did so without even reasonable suspicion that criminal activity was afoot. I believe that *Hodari D.* overrules *Jeffries sub silentio* by holding that a chase does *not* constitute a seizure under the Fourth Amendment.

ment, appellants further contend that the police officers' pursuit or chase violates Article 1, Section 8 of the Pennsylvania Constitution which provides: "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...." Just as the Federal Constitution fails to define specifically what constitutes a seizure, Article 1, section 8 of the Pennsylvania Constitution also fails to specifically define what constitutes a seizure.

As this Court recognized in *Commonwealth v. Ellis*, 541 Pa. 285, 662 A.2d 1043, 1046 (1995), there are essentially three categories of encounters between citizens and the police: (1) custodial detentions, (2) investigative detentions, and (3) mere encounters. In determining whether the contraband that each of the appellants discarded should be suppressed, we must first determine into which of these categories a police pursuit, like those at issue, falls into so as to determine whether the police were required to possess a requisite level of information before pursuing appellants and, if so, whether police in fact possessed the requisite information that would make lawful both the encounter and the ensuing obtaining of contraband discarded as a result of the encounter.

### 1. *Custodial Detentions*

It is well-settled law in Pennsylvania that police must have probable cause to effect a lawful arrest or custodial detention. *Commonwealth v. Rodriquez*, 532 Pa. 62, 614 A.2d 1378 (1992); *accord Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). If police do not have the requisite probable cause for such a seizure, evidence seized or discovered as a result of the unlawful seizure will normally be suppressed unless it falls into certain recognized exceptions. The question is therefore, what police conduct constitutes an arrest or a custodial detention?

In *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304, 311 (1963), *cert. denied*, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963), this Court grappled with and answered such a question. Initially the Court noted that "[o]fficers are not required to make any formal declaration of arrest or use the word

'arrest'," in order for an arrest to exist. The Court further noted that although an arrest can occur when police seize a person physically, that an arrest may still occur where there is no physical restraint "as to be visible to the eye." *Id.* (*citing McAleer v. Good,* 216 Pa. 473, 475, 65 A. 934, 935 (1907)). Where there is no such physical restraint, the Court stated that an arrest occurs by "any act that indicates an intention to take [a person] into custody *and* subjects him to the actual control and will of the person making the arrest" (*citing with approval* 5 Am.Jur.2d *Arrest* § 1, p. 695) (emphasis added). *See Commonwealth v. Ellis,* supra, 541 Pa. at 292–294, 662 A.2d at 1047 (custodial detention is deemed to arise when the conditions or duration of an investigative detention become so coercive that a reasonable person feels that he or she is unable to leave).

In *Bosurgi,* police were notified of a burglary at a jewelry store during which watches and jewelry were stolen. The next day, police received a telephone call from an anonymous source claiming that a man was attempting to sell watches in a certain taproom located near the burglarized store. The caller described the man as having bushy grey hair, needing a shave, short in stature, swarthy in appearance, and wearing tweed pants and a striped shirt. Police investigated the information and went to the taproom but found no one there that matched the description. The detectives then went into the taproom located directly across the street from the burglarized store where they observed Bosurgi, who matched the description, seated at a table.

One of the detectives approached Bosurgi and ordered him to stand up. When Bosurgi complied, the detective turned him around and patted him down, at which time he felt the watches in Bosurgi's trousers pockets. The detective removed eight watches from Bosurgi's pockets which were identified as part of the stolen merchandise. The detective also found bits of glass in Bosurgi's pockets, which were later found to have matched the glass of the burglarized store.

The trial court granted Bosurgi's motion to suppress the evidence seized from him holding that the evidence was ob-

tained as a result of an unlawful search and seizure under the United States and Pennsylvania Constitutions. The Superior Court reversed the trial court's suppression ruling. Upon appeal to this Court, this Court held that Bosurgi's submission to the detectives' show of authority in the taproom did amount to an arrest. However, the Supreme Court affirmed the Superior Court because it found that the search was nevertheless lawful because the detectives had probable cause for the arrest.[2]

Under *Bosurgi*, therefore, like *Hodari D.*, an arrest occurs when the suspect is under the actual physical control of a police officer or when the suspect, feeling that he is not free to leave, submits to a police officer's show of force or authority. In the matters at issue here, appellants were neither under the police officers' actual physical control, nor did they submit to any exercise of force or authority by the officers.[3] Rather, appellants simply ran, of their own volition and in any direction that they chose, upon merely seeing a police officer approach them. Clearly, appellants were not under arrest, nor were they subjected to a custodial detention pursuant to *Bosurgi*.[4]

**2.** It is well established that if an arrest is lawful, then a search and seizure incident to the arrest are valid. *Commonwealth ex rel. Whiting v. Rundle*, 414 Pa. 17, 19, 198 A.2d 568, 569 (1964); *Commonwealth v. Bosurgi*, 411 Pa. 56, 67, 190 A.2d 304, 310 (1963), *cert. denied*, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963); *Commonwealth v. Cockfield*, 411 Pa. 71, 75, 190 A.2d 898, 900 (1963), *cert. denied*, 375 U.S. 920, 84 S.Ct. 265, 11 L.Ed.2d 164 (1963); *accord, Wilson v. Schnettler*, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961).

**3.** Indeed, there is no indication in the record that any show of force was made.

**4.** *See Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995) (citing *Bosurgi*; arrest, in addition to indicating intention to take one into custody, requires that the suspect is "actually restrained of his freedom"); *Commonwealth v. Lovette*, 498 Pa. 665, 672, 450 A.2d 975, 978 (1982), *cert. denied*, 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983) (citing *Bosurgi*, defendant was under arrest after police conducted a pat down search and placed him in the police vehicle); *Commonwealth v. Holmes*, 482 Pa. 97, 109, 393 A.2d 397, 403 (1978) (citing *Bosurgi*, defendant was under arrest when a police officer escorted him to a room and locked the door to the room as it constituted an act showing an intention to place defendant in custody and subjecting him

## 2. Investigative Detention

An investigative detention occurs when police stop and detain a person to investigate. However, such a detention will rise to the level of an arrest unless the detention is for a relatively brief period of time and there are no coercive conditions present which constitute the functional equivalent of arrest. *Commonwealth v. Ellis, supra,* 541 Pa. at 292–294, 662 A.2d at 1047 (officer's detention of defendant constituted investigative detention rather than custodial detention where defendant was detained for only ten to fifteen minutes until second officer arrived, where defendant's vehicle matched the description of the vehicle involved in a burglary, where the

to the control and will of the officer); *Steding v. Commonwealth,* 480 Pa. 485, 391 A.2d 989 (1978) (citing *Bosurgi;* suspect seized when police "stopped him from leaving"); *Commonwealth v. Silo,* 480 Pa. 15, 22, 389 A.2d 62, 65 (1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1053, 59 L.Ed.2d 94 (1979) (citing *Bosurgi;* defendant was not under arrest where only actions by the police officers were their arrival at the hospital and requesting defendant's clothing from an intensive care nurse; such action did not communicate an intent of taking defendant into custody); *Commonwealth v. Farley,* 468 Pa. 487, 494, 364 A.2d 299, 302 (1976) (citing *Bosurgi;* arrest occurred as defendant was subject to control of officers following a neighborhood squabble which police officers responded to because defendant was not free to refuse to comply with police orders taking him into custody or free to leave police station once he arrived); *Commonwealth v. Murray,* 460 Pa. 53, 60, 331 A.2d 414, 417 (1975) (citing *Bosurgi;* seizure occurred where individual proceeding in an automobile was forced to stop at police discretion); *Commonwealth v. Richards,* 458 Pa. 455, 459, 327 A.2d 63, 64 (1974) (citing *Bosurgi;* notwithstanding that defendant agreed to accompany police officer to station, he was under arrest since he submitted to the officer's restraint when upon becoming ill defendant was taken to the hospital where a police officer was instructed to and did remain with him at all times during a six hour period and then returned him to the station where defendant refused to participate in any further discussions); *Commonwealth ex rel. Knowles v. Lester,* 456 Pa. 423, 426, 321 A.2d 637, 639 (1974) (citing *Bosurgi;* lodging of a detainer against a person already in-custody is an additional restraint upon liberty and therefore an arrest); *Commonwealth v. Daniels,* 455 Pa. 552, 555, 317 A.2d 237, 238 (1974) (citing *Bosurgi;* suspect was under arrest notwithstanding that he voluntarily accompanied police to headquarters for questioning where suspect was subject to the will of the officers and because he was not truly free to leave upon failing a polygraph test); *Commonwealth v. Sharpe,* 449 Pa. 35, 41, 296 A.2d 519 (1972) (citing *Bosurgi;* suspect was under arrest when ordered to stop and, submitting to such an order, approached police car).

officer's suspicions were diligently pursued, and where the period of detention was primarily used for the legitimate purpose of issuing a traffic citation).[5] In the matters here, the interaction between appellants and the police did not rise to the level of an investigative detention in that appellants were not detained in any way nor were their physical movements restricted in any manner by police. Clearly, the officers' conduct of mere pursuit of appellants without any intrusion upon their path of flight cannot be deemed to amount to an investigatory stop.

### 3. Mere Encounter

Mere encounters, unlike custodial or investigative detentions, need not be supported by either probable cause or a reasonable suspicion. A mere encounter occurs where an officer approaches another person, but the person has no official obligation to stop or to respond to police questions or remarks. *Commonwealth v. Ellis, supra,* 541 Pa. at 292–294, 662 A.2d at 1047.[6] *Accord Commonwealth v. Berrios,* 437 Pa.

**5.** *See Commonwealth v. Haggerty,* 495 Pa. 612, 435 A.2d 174 (1981) (detention of suspect who consented to being transported to police barracks to answer questions, did not become custodial until after suspect made admissions of guilt during polygraph test); *Commonwealth v. Bybel,* 399 Pa.Super. 149, 581 A.2d 1380 (1990), *vacated on other grounds,* 531 Pa. 68, 611 A.2d 188 (1992) (defendant was not subject to custodial interrogation rather, he was subject to investigatory detentions where defendant voluntarily went to police station and was not under arrest or subjected to force of threat of force); *Commonwealth v. Douglass,* 372 Pa.Super. 227, 539 A.2d 412 (1988), *appeal denied,* 520 Pa. 595, 552 A.2d 250 (1988) (detention arising from the consensual transportation of defendant to police barracks for a breathalyzer test constituted only an investigative detention); *Commonwealth v. Stubblefield,* 413 Pa.Super. 429, 437, 605 A.2d 799, 803 (1992), *appeal denied,* 533 Pa. 633, 621 A.2d 580 (1993) (once police became reasonably suspicious that defendant was involved in criminal activity and then directed defendant to ticket counter to answer questions, mere encounter developed into an investigative stop or detention).

**6.** *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Commonwealth v. Edmiston,* 535 Pa. 210, 227, 634 A.2d 1078, 1088 (1993) (interaction with defendant was mere encounter under which he was under no official compulsion to respond where appellant voluntarily spoke with police and never asked for assistance of an attorney and was never told he did not need attorney); *Commonwealth v. Lidge,* 399 Pa.Super. 360, 582 A.2d 383 (1990), *appeal denied,* 527 Pa.

338, 340, 263 A.2d 342, 343 (1970) (police may legally stop and question a person without probable cause or reasonable suspicion). *See Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1878–1879, n. 16, 20 L.Ed.2d 889 (1968) (not every encounter between police officers and citizens amounts to a seizure; "there is nothing in the [federal] constitution which prevents a policeman from addressing questions to anyone on the streets".)

Here, police were not even afforded the opportunity for a mere encounter to address questions to appellants since appellants left the area immediately upon their detection of police approaching. Police, without stopping, questioning, or otherwise interfering with appellants' course of behavior, simply followed appellants along the public highway at a pace set by appellants themselves. *See Commonwealth v. Hall,* 475 Pa. 482, 488, 380 A.2d 1238, 1242 (1977), *quoting, Commonwealth v. Jones,* 474 Pa. 364, 370, 378 A.2d 835, 838 (1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978) (there is nothing in the Constitution which prevents a police officer from approaching a person on the street in order to make inquiries of that person) (citations omitted). Under these circumstances, the action of the police did not even rise to the minimal intrusion which constitutes a mere encounter. Therefore, I would hold that the police did not need probable cause or even a reasonable suspicion to follow each of the appellants as they took flight. The mere approach of a police officer is not the type of showing of authority which invokes the protection of the search and seizure laws of this Commonwealth.

Having been lawfully on the public highway, police should be able to lawfully seize the discarded contraband which was in plain view and in a public location. *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993–994, 19 L.Ed.2d 1067 (1968) (items appearing within the plain view of an officer who

598, 589 A.2d 689 (1991) (interaction between defendant who engaged in a consensual conversation in a public place with police officers, did not rise to investigative detention because defendant was not detained in any manner).

has a right to be in that position are subject to seizure); *Commonwealth v. Harris,* 479 Pa. 131, 387 A.2d 869 (1978) (where police have a lawful right to be in the position of observation, they can lawfully seize objects in plain view). Obviously, once police observed and seized the abandoned contraband, police then had sufficient probable to arrest each appellant.

The majority's reliance upon *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), in reaching the majority's conclusion that such circumstances *sub judice* give rise to a seizure, is wholly misplaced. As the majority states, the test is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." 446 U.S. at 554, 100 S.Ct. at 1877. Here, each defendant clearly believed he *was* free to leave as each was indeed exercising this belief by leaving the respective locations when police officers approached. The police did not physically stop the defendants from leaving, did not order the defendants to stop and, indeed, did not interfere with their freedom in *any* manner. The officers here were in a public place attending to their assigned duties. Appellants chose to flee rather than confront the officers. They should not now be able to complain if the officers chose to give pursuit, as is their lawful authority. To hold that a police officer cannot pursue an individual in the situations described here is to give to the interpretation of the Pennsylvania Constitution, an absurdity that was never meant by its framers.

The Constitutional provision at issue was designed to punish or deter improper police conduct. The officers' unintrusive conduct here cannot be said to be improper. Logically, the holding by the majority may be extended to prevent police officers from pursuing vehicles on the highway or from following suspicious individuals on the public streets unless the police possess probable cause or reasonable suspicion to believe a crime has occurred. Evidence voluntarily abandoned during these situations would most likely be suppressed under the majority's opinion. Part of a police officer's duty is to

investigate crime before it occurs, not simply stand by idly and wait for an offense to be committed before taking action. A visible police presence is essential to satisfy this duty. That a person voluntarily chooses to flee from the "mere presence" of a police officer should not immunize that person when he abandons contraband, weapons, or any other evidence during the course of his flight and a police officer's pursuit. In sum, "there is but one step from the sublime to the ridiculous." (Attributed to Napoleon I, after his retreat from Russia, December, 1812). Such step has now been taken by the majority which inexplicably affords to criminals in Pennsylvania greater protection for their deviant conduct than that afforded criminals in our sister states and which now greatly restricts police officers' effectiveness in ferreting out criminal conduct.

Accordingly, I respectfully dissent and would affirm the orders of the Superior Court.