J-A21018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SAMUEL RIVERA | |
| Appellant | No. 3079 EDA 2013 |

Appeal from the Judgment of Sentence October 31, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006946-2013

BEFORE:  BOWES, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                        **FILED NOVEMBER 06, 2014**

Samuel Rivera appeals from the judgment of sentence imposed October 31, 2013, in the Philadelphia County Court of Common Pleas.  The trial court imposed a sentence of three years' reporting probation after finding Rivera guilty of one count of possession of a controlled substance (cocaine).[1]  On appeal, Rivera challenges the trial court's denial of his pretrial suppression motion.  For the reasons set forth below, we affirm.

The facts underlying Rivera's arrest and conviction are summarized by the trial court as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(16).

On February 11, 2013, at approximately 10:25 a.m., Officer [Christopher] Daukaus and his partner … were traveling northbound on the 2900 block of North 3rd Street when Officer Daukaus observed Rivera having a conversation with an unknown Hispanic male. Rivera then reached into his pocket, removed his hand, and as he was reaching toward the Hispanic male, he looked toward Officer Daukaus and immediately put his hand back into his pocket and began to walk southbound on North 3rd Street. Believing he had observed a narcotics transaction, Officer Daukaus exited his vehicle and told Rivera to stop. In response, Rivera began to run and then hopped on a nearby bicycle and continued southbound down North 3rd Street. He went several blocks … and ultimately ended up on North Philip Street where Officer Daukaus and [his partner] attempted to apprehend him. As the officers struggled with Rivera, Rivera stuffed a clear sandwich baggie containing a white substance into his mouth. After Rivera spit out the baggie, [Officer Daukaus's partner] placed him under arrest and Officer Daukaus recovered the baggie, which contained twelve (12) clear packets containing a white substance, alleged cocaine. Incident to the arrest, Officer Daukaus recovered a number of clear packets with a blue insert containing a white substance, alleged heroin, from Rivera's person – one (1) from his left hand, one (1) from his left jacket pocket, and fourteen (14) from his right inside jacket pocket. The officer also recovered $114 U.S. currency form Rivera.

Trial Court Opinion, 1/6/2014, at 2-3.

Rivera was subsequently charged with one count each of possession of controlled substances and possession with intent to deliver controlled substances ("PWID").[2] He filed a timely pretrial motion to suppress the evidence recovered as a result of what he believed to be an unlawful seizure. A suppression hearing was conducted on October 31, 2013, and at the close of the testimony, the trial court denied Rivera's motion to suppress. The

---

[2] 35 P.S. § 780-113(a)(30).

case proceeded immediately to a non-jury trial, at which time the testimony from the suppression hearing was incorporated into the record and no further testimony was presented. Thereafter, the trial court found Rivera guilty of possession of a controlled substance, but not guilty of PWID. Rivera was sentenced that same day to a term of three years' reporting probation, and this timely appeal followed.[3]

Rivera's sole issue on appeal challenges the trial court's denial of his pretrial suppression motion. Specifically, Rivera contends Officer Daukaus lacked reasonable suspicion or probable cause to stop him when the officer observed Rivera simply "put his hand in his pocket, [take] something out and put his hand back in his pocket." Rivera's Brief at 9. Therefore, he asserts the drugs the officers recovered following his subsequent flight were the fruits of the initial unlawful seizure.

Our review of an order denying a pretrial motion to suppress is well-established.

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the

---

[3] On December 11, 2013, the trial court ordered Rivera to file a concise statement or errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Rivera complied with the trial court's directive, and filed a concise statement on December 31, 2013.

> defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Delvalle*, 74 A.3d 1081, 1084 (Pa. Super. 2013) (citations omitted).

In the case *sub judice*, there is no dispute that, after observing what he believed to be a drug transaction, Officer Dauhaus attempted to make an investigatory detention of Rivera by ordering Rivera to stop. Accordingly, we must determine whether, at that time, Officer Dauhaus had reasonable suspicion to believe Rivera was engaging in criminal activity. *See Commonwealth v. Zhahir*, 751 A.2d 1153, 1156 (Pa. 2000) ("[A] police officer may, short of an arrest, conduct an investigative detention if he has a reasonable suspicion, based upon specific and articulable facts, that criminality is afoot.").

When determining whether reasonable suspicion exists to justify a police stop, we must bear in mind the following:

> A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." In order to determine whether the police

officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give "due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience." Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer."

*Commonwealth v. Foglia*, 979 A.2d 357, 360 (Pa. Super. 2009) (*en banc*)

(internal citations and quotation omitted). This Court has held that, in determining whether a police officer possessed the requisite reasonable suspicion, "[e]vasive behavior … is relevant[,]" as is an officer's prior experience.[4] *Id.* at 361.

Here, the trial court found that Officer Dauhaus had reasonable suspicion to believe Rivera was engaged in criminal behavior when he ordered Rivera to "stop." The court explained:

In the instant case, Officer Daukaus observed Rivera reach into his pocket, remove his hand and begin to reach toward the Hispanic male with whom he was standing. Upon seeing Officer Daukaus, Rivera immediately put his hand back into his pocket and began to walk away from the area. When told to stop,

_____

[4] With regard to a police officer's prior experience in the context of a weapons frisk, the *Foglia* Court stated:

[I]f a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search of the location where the hand movements occurred.

*Foglia*, *supra*, 979 A.2d at 361.

Rivera began to run from the officer and then hopped on a nearby bicycle and continued to flee from police. Officer Daukaus'[s] knowledge of drug sales in the area, for which he made numerous arrests, taken in conjunction with his observations of Rivera's hand movements gave rise to Officer Daukaus'[s] reasonable suspicion of a narcotics transaction, for which he was entitled to conduct an investigative detention. Rivera's ensuing flight from the officers through the neighborhood and his ultimately spitting out a baggie containing a white substance, alleged cocaine, contributed to the totality of the circumstances providing Officer Daukaus[] with probable cause to stop and search Rivera.

Trial Court Opinion, 1/6/2014, at 5.

Rivera contends, however, that Officer Daukaus's observations prior to the stop were insufficient to justify a reasonable belief that Rivera was engaged in criminal behavior. He emphasizes that the officer did **not** witness an "exchange of money or objects,"[5] and, therefore, was operating under an "unparticularized 'hunch'" that a narcotics transaction was occurring. Rivera's Brief at 11-12. He describes what Officer Daukhaus observed as follows: "Mr. Rivera merely spoke with another person, during the day in a residential neighborhood, took something out of his pocket and put it back." *Id.* at 13.

Rivera also argues Officer Daukhaus had "fairly limited experience with drug arrests[,]" so that his observations were not enhanced by his own experience. *Id.* at 13. Furthermore, Rivera asserts that his flight should not have "play[ed] a role in [the officer's] decision to stop" him because he fled

---

[5] Indeed, Officer Daukhaus testified on cross-examination: "I witnessed no exchange." N.T., 10/31/2013, at 18.

only **after** Officer Daukhaus ordered him to stop. **Id.** at 14. Accordingly, he contends because the initial seizure was unconstitutional, the drugs recovered following the subsequent chase should have been suppressed as "fruit of the poisonous tree." **Id.** at 15.

The decision of the Pennsylvania Supreme Court in **Commonwealth v. Cook**, 735 A.2d 673 (Pa. 1999), is instructive. In **Cook**, two officers, in an unmarked vehicle, were patrolling a block in the City of Harrisburg between 8:00 p.m. and 1:00 a.m. They noticed three individuals, one of whom was the defendant, conversing on a corner. As the officers passed in their vehicle,

> they observed [the defendant] take his left hand out of his front pocket in a fist position and reach toward one of the other individuals. The individual reached out toward [the defendant] and attempted to receive the unidentified item from his hand. To further investigate this conduct, [the officers] made a U-turn and drove to the corner where the group was gathered. As soon as [the defendant] spotted the officers and the car, he placed his hand back in his pocket and began backing away from the group. [One officer] exited the car, identified himself as a Harrisburg police officer, and began walking toward the group. [The defendant] immediately began to run "in almost a dead sprint."

**Id.** at 674. During the chase, the defendant abandoned a sandwich bag, which contained crack cocaine, and two pagers. The defendant was subsequently arrested, and moved to suppress the evidence recovered from what he described as an illegal seizure. The trial court denied his request, and this Court affirmed on appeal. The Supreme Court granted review to

determine whether the police officers "demonstrated reasonable suspicion to stop" the defendant. *Id.*

In holding the seizure was supported by reasonable suspicion, the Supreme Court emphasized the similarities of the facts before it with those in the seminal decision, *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, an officer, with 30 years' experience patrolling for shoplifters, observed the defendant and another man "taking turns pacing down the street and peering into a nearby store window and then walking back to the corner and rejoining his companion." *Cook*, *supra*, 735 A.2d at 676. They also spoke briefly with a third man who then walked away. After the men continued this routine for 10 to 12 minutes, they walked off together before meeting up again with the third man. At that point, the officer began to suspect that the two were "'casing a job," and decided to stop them to investigate further. *Id.*, *quoting Terry*, *supra*, 392 U.S. at 6. The officer asked for the men's names, and when they mumbled a response, the officer grabbed the defendant and patted him down, at which time he recovered a firearm.

The *Terry* Court concluded that the search was based upon reasonable suspicion. Relying on *Terry*, the *Cook* Court explained:

> [T]he decision in *Terry* was based, in part, on the "recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." "It was this legitimate investigative function [the officer] was discharging when he decided to approach [Terry] and his companions." In light of this recognition, the Court created a test, which balanced the need to search against the invasion which the search entails. In

order to justify the search, the police officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." **Even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.** Moreover, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to **the specific reasonable inferences he is entitled to draw from the facts in light of his experience**." This standard, less stringent than probable cause, is commonly known as reasonable suspicion.

*Cook*, *supra*, 735 A.2d at 676.

With regard to the case before it, the *Cook* Court noted that both of the officers involved in the stop had been assigned to the "street level drug interdiction unit" for two years, and one officer had made "prior drug arrests in the same area where the instant incident occurred." *Id.* at 677. Further, like the officer in *Terry*, the officers in *Cook* "made firsthand observations of completely innocent conduct--[*i.e.*, the attempted hand-off of an unknown object]-- … which immediately aroused their suspicions" based upon their experience in drug investigations. *Id.* The Court explained:

Similar to the situation that existed in *Terry*, it is beyond peradventure that it was part of the legitimate investigative function of police work for the officers in the instant case to investigate the situation further. This belief prompted them to make a U-turn and approach the group on the corner, at which point appellant withdrew his hand from the other individual and began to back away. When the police officers went to investigate, appellant fled. Thus, based on the facts surrounding the instant case, including the police officers' training, expertise and past drug arrests in the same area; the attempted exchange of an unidentified object in a high crime area, appellant's nervous behavior when the police made a U-turn; and appellant's flight, the police officers were able to point to specific

and articulable facts, which in light of their police training and expertise, supported a finding of reasonable suspicion.

*Id.* at 677-678.

We find the facts presented in the instant matter to be substantially similar to those in *Cook*. Although Officer Daukaus had been a police officer for only three years, he testified that he had been assigned to the same district for that entire time. N.T., 10/31/2013, at 10. More importantly, he stated that he observed "many" narcotics transactions over that three year period, and made approximately 10 to 15 arrests on that very block, "almost all" of which were for narcotics. *Id.* at 10-11. Furthermore, Officer Daukaus testified the attempted transaction he observed on the day in question was "extremely similar" to those he had observed in the past. *Id.* at 11. While the officer acknowledged he did not witness an actual hand-to-hand exchange, he stated that he observed Rivera "reaching in, going to hand [the other man] something, looking back at us and then bringing, closing his hand up and putting it back into his pocket." *Id.* at 18. Officer Daukaus testified that he saw objects in Rivera's hand, and although he "couldn't make out what they were, … [he] knew they weren't any type of money or small coins or anything like that." *Id.* at 17. Based on his prior experience, Officer Daukaus believed he had interrupted a hand-to-hand narcotics transaction.[6] *Id.* at 20.

_____

[6] We note that Rivera, relying *Commonwealth v. Maxon*, 798 A.2d 761 (Pa. Super. 2002), contends that Officer Daukaus simply acted on an
*(Footnote Continued Next Page)*

While we agree that we may not consider Rivera's subsequent flight in our reasonable suspicion analysis because Rivera fled after the officer attempted to stop him, we may consider Rivera's **evasive behavior** once he noticed the uniformed officers nearby. Notably, Officer Daukhaus testified that as Rivera began to hand something to the other man, Rivera "turned in [the officers'] direction, quickly put his hand back into his pocket, quickly put his body (sic) away and began to walk" in the opposite direction.[7]  *Id.* at 7-8.  **See Foglia**, **supra**, 979 A.2d at 361 (stating "[e]vasive behavior … is relevant in the reasonable-suspicion mix.").

*(Footnote Continued)* ———————————

"unparticularized 'hunch.'"  We disagree.  The officers in **Maxon**, acting on a tip that the defendant was dealing drugs, conducted surveillance of the defendant's vehicle and home.  However, the only activity they observed, before stopping and questioning him, was "Maxon drive to, enter and exit several buildings … [and] bring a baggie out of his residence but [the officers] could not see its contents."  *Id.* at 169.  The Court found that "[a]lthough it was plausible that Maxon was engaged in illegal conduct, there was nothing irregular or suspicious about his or his passenger's behavior." *Id.*  Here, Officer Daukaus witnessed an attempted hand-to-hand transaction, followed by Rivera's evasive behavior when he discovered the police were nearby.  Therefore, we do not find **Maxon** controlling.

[7] We recognize that the defendant in **Cook** fled as soon as the investigating officer identified himself.  **Cook**, **supra**, 735 A.2d at 674.  **See also** Rivera's Brief at 14 n.4 (arguing **Cook** is not "on point" because, in that case, "flight was a critical factor that contributed to the justification for the stop."). However, we do not find that distinction to be dispositive.  Here, although Rivera did not begin running until after Officer Daukaus ordered him to stop, he did "quickly" end his transaction as soon as he saw the officer, and began to walk away.  N.T., 10/31/2013, at 7.  We find these actions sufficient to constitute "evasive behavior."

- 11 -

Therefore, considering the totality of the circumstances before Officer Daukaus -- including his observations of Rivera in light of the officer's experience and Rivera's evasive behavior -- we detect no basis upon which to disturb the finding of the trial court that the officer had reasonable suspicion to conduct an investigatory stop of Rivera.[8]  Further, we agree that

_____

[8] We note that, contrary to Rivera's suggestion, there is no minimum set of circumstances required to support a finding of reasonable suspicion. **See** Rivera's Brief at 14 (noting that additional factors suggesting criminal activity were not present in this case).  As the **Cook** Court explained,

> [C]ircumstances may exist which require a police officer on the "beat" who has made on the spot observations to take immediate action or investigate further by stopping and perhaps frisking the individual involved.  **Terry v. Ohio**, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
>
> * * * *
>
> Case law has established that certain facts, taken alone, do not establish reasonable suspicion.  **Commonwealth v. Matos**, 543 Pa. 449, 672 A.2d 769 (1996) (flight alone does not constitute reasonable suspicion); **Commonwealth v. DeWitt**, 530 Pa. 299, 608 A.2d 1030 (1992) (flight alone does not constitute reasonable suspicion); **Commonwealth v. Kearney**, 411 Pa.Super. 274, 601 A.2d 346 (1992) (mere presence in a high crime area does not warrant a stop).  However, a combination of these facts may establish reasonable suspicion. **Terry v. Ohio**, 392 U.S. at 22, 88 S.Ct. 1868 (innocent facts, when taken together, may warrant further investigation); **Commonwealth v. Riley**, 715 A.2d 1131, 1135 (Pa. Super. 1998) ("a combination of circumstances, none of which alone would justify a stop, may be sufficient to achieve a reasonable suspicion").

**Cook**, **supra**, 735 A.2d at 676, 677.  As explained above, here, we find that Officer Daukaus had reasonable suspicion that Rivera was engaging in criminal behavior.
*(Footnote Continued Next Page)*

Rivera's subsequent flight and attempt to secrete a baggie containing what appeared to be narcotics in his mouth, supported the officers' probable cause to arrest him. Accordingly, Rivera is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2014

*(Footnote Continued)* ⸻