J-A22003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARRYL WHITE | : | No. 103 EDA 2017 |

Appeal from the Order November 28, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0012105-2015

BEFORE: BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.: **FILED FEBRUARY 08, 2019**

The Commonwealth appeals from the order granting Appellee Darryl

White's suppression motion.[1] The Commonwealth asserts that the trial court

erred when it suppressed a gun that Appellee discarded while being pursued

by police officers. We reverse the order granting suppression and remand for

further proceedings.

On October 14, 2015, Appellee was arrested and charged with firearms

not to be carried without a license and carrying a firearm in Philadelphia.[2]

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The Commonwealth certified that the trial court's suppression order terminated or substantially handicapped the prosecution of this matter at the time it filed its notice of appeal from this interlocutory order. **See** Notice of Appeal, 12/27/16; Pa.R.A.P. 311(d).

[2] 18 Pa.C.S. §§ 6106(a) and 6108, respectively.

Appellee filed a motion to suppress evidence of the firearm recovered from the incident. *See* Omnibus Mot., 12/29/15, at 1 (unpaginated).

We summarize the evidence presented at the hearing on Appellee's motion to suppress. Philadelphia Police Officer Mark Trani testified that on October 14, 2015, at about 5:30 p.m., he and his partner, Officer William Beck, were on patrol in uniform in a marked police car. The officers observed a crowd of ten to twelve males on the 1700 block of South Hollywood Street, Philadelphia. Officer Trani described the area as a high crime area in which he had made multiple arrests related to domestic incidents. Office Trani also indicated that he had been informed of shootings and drug activity in the area during pre-shift briefing.

The officers stopped to disperse the crowd. When Officer Trani exited his vehicle to urge the crowd to move, he made eye contact with Appellee. Officer Trani stated that he observed Appellee "start walking away, . . . turn[], grab[] his waistband, and start[] running" away from the crowd. N.T. Suppression Hr'g, 8/11/16, at 5. After Appellee started running, Officer Trani told him to stop. Officer Trani testified that he then began to chase Appellee, and observed Appellee take out and hold a silver revolver in his hand. Officer Trani then saw Appellee drop the firearm in the sewer. The parties stipulated that a loaded .38 caliber Taurus handgun was recovered from the sewer.[3]

_____

[3] Officer Beck also testified at the suppression motion hearing. His account of the events corroborated Officer Trani's testimony that neither officer said

- 2 -

On cross-examination, Officer Trani agreed that shortly after the incident he had given a statement to detectives in which he indicated that "police began chasing [Appellee] and **then** he pulled out a silver handgun from his waistband and had the gun in his right hand." *Id.* at 13 (emphasis added). When asked for clarification of the order in which Appellee took out the gun and Officer Trani began chasing him, the following exchange took place:

Q. So, which one is it?

A. Starting to run, took out the gun, start chasing him.

Q. So when you told detectives that you started chasing him then he pulled out the handgun, that was incorrect?

A. I believe so.

*Id.* Officer Trani also indicated that he and Officer Beck had "stopped a group of males for investigation and that's when [Appellee] walked off."[4] *Id.* at 11.

Following argument on the motion to suppress, the trial court held the motion under advisement. On November 28, 2016, the court granted the motion to suppress. This timely interlocutory appeal as of right followed.

_____

anything before Appellee began to run and that Officer Trani told Appellee to stop after Appellee began running. *See* N.T. Suppression Hr'g, 8/11/16, at 23-24.

[4] At the suppression motion, Appellee's counsel initially argued that the group was seized by the "investigation," and therefore Appellee was seized before walking and then running away. However, counsel conceded that the police first engaged in a mere encounter with the crowd before Appellee began to walk away. *See* N.T. Suppression Hr'g, 8/11/16, at 29-30.

The Commonwealth and the trial court complied with Pa.R.A.P. 1925. In its Rule 1925(a) opinion, the court found that

the officers pulled up and got out of their vehicle, for no other reason than to disperse a milling crowd solely because it was blocking a sidewalk and part of a street, and as they were approaching the crowd [Appellee], who was presumably a member of it, started to walk away, [Officer] Trani and [Appellee] caught each other's eye, which could have given [Appellee] the impression that he was being approached with the obvious intention to detain and question him, [Appellee] started running away, [Officer] Trani yelled "stop" and started chasing him and then he started reaching for his waistband, pulled out the gun and dropped it in the sewer.

Trial Ct. Op., 1/19/17, at 5-6. Based upon these findings, the court concluded that suppression was warranted since the pursuit was unjustified and caused the abandonment of the firearm. *Id.* at 6.

On appeal, the Commonwealth raises the following question for our review:

Did the [trial] court err in ruling that there was no reasonable suspicion to stop [Appellee] when police officers in a high crime area saw [Appellee] look in their direction, grab at his waistband in a manner consistent with having a weapon, and immediately flee?

Commonwealth's Brief at 4.

The Commonwealth asserts that the trial court erred in concluding that Appellee's abandonment of the firearm was preceded by an illegal seizure. *Id.* at 8. According to the Commonwealth, the officers' initial approach of the crowd, of which Appellee was a part, constituted a mere encounter. *Id.* Thereafter, Appellee grabbed at his waistband and ran from the police,

- 4 -

unprovoked. The Commonwealth suggests that because this conduct occurred in a high crime area, the officers had reasonable suspicion to pursue Appellee. *Id.*

Appellee counters that "[t]he [trial] court's order suppressing evidence must be affirmed where the Commonwealth failed to sustain its burden of establishing that there was reasonable suspicion to justify the police in stopping Appellee." Appellee's Brief at 8. Appellee asserts that even if the Commonwealth demonstrated that the area was a "high crime area," Pennsylvania courts have not established a "*per se* rule that flight in a high crime area equates to reasonable suspicion." *Id.* at 10. Additionally, Appellee argues that the eye contact between him and Officer Trani provoked his flight. *Id.* at 11.

> When we review the grant of a suppression motion,
>
> we must determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn from those facts are correct. We may only consider evidence presented at the suppression hearing. In addition, because the defendant prevailed on this issue before the suppression court, we consider only the defendant's evidence and so much of the Commonwealth's evidence as remains uncontradicted when read in the context of the record as a whole. We may reverse only if the legal conclusions drawn from the facts are in error.

*Commonwealth v. Hemingway*, 192 A.3d 126, 129 (Pa. Super. 2018) (citation omitted).

Three levels of interaction occur between police and citizens that are relevant to whether a particular search or seizure conforms with the Fourth

Amendment to the United States Constitution and article I, section 8 of the

Pennsylvania Constitution:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

> \* \* \*

> [T]he investigative detention or **Terry**[5] stop . . . subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest[.] . . . To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion[.] . . . To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of

_____

[5] **Terry v. Ohio**, 392 U.S. 1 (1968). We note that

> [t]he **Terry** decision and its progeny stated "that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articu[l]able basis for suspecting criminal activity." **Michigan v. Summers,** [452 U.S. 692, 699 (1981)]

**Commonwealth v. Lovette**, 450 A.2d 975, 979 (Pa. 1982) (footnote omitted).

physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Commonwealth v. Lyles*, 54 A.3d 76, 79-80 (Pa. Super. 2012) (citations omitted).

A person merely approached by or in the presence of police "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality); *see also In re J.G.*, 860 A.2d 185, 189 (Pa. Super. 2004) (holding that where the appellant "merely 'started to walk away,'" police officers lacked a reasonable basis to suspect he was engaged in criminal activity). Under Pennsylvania law, pursuit of an individual by the police is considered to be a seizure that must be supported by reasonable suspicion.[6] *See Commonwealth v. Matos*, 672 A.2d 769, 774 (Pa. 1996).

However, an individual's "unprovoked flight in a high crime area" may provide the police with reasonable suspicion to conduct a *Terry* stop of that individual. *See In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001) ("it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment"); *Commonwealth v. Jefferson*, 853 A.2d 404, 405-06 (Pa. Super. 2004) (noting that the Pennsylvania and federal constitutions protect the same

---

[6] Under federal law, such pursuit does not require reasonable suspicion. *See Matos*, 672 A.2d at 772.

interests, and flight from police in a high crime area is sufficient to create reasonable suspicion under both). *But see Commonwealth v. Washington*, 51 A.3d 895, 899 & n.4 (Pa. Super. 2012) (holding that where the defendant was not knowingly running from the police, "there [was] no nexus between running and reasonable suspicion of criminal activity"); *Commonwealth v. Taggart*, 997 A.2d 1189, 1196 (Pa. Super. 2010) (holding that where the defendant was not in a high crime area and no other factors other than his flight existed to support a finding of reasonable suspicion, police pursuit of the defendant was an unlawful seizure).

Instantly, both parties agree that when Officer Trani pursued Appellee, he attempted to conduct an "investigative detention" or *Terry* stop of Appellee, which required reasonable suspicion that criminal activity was afoot. *See* Commonwealth's Brief at 6; Appellee's Brief at 8. The parties disagree, however, as to when the investigative detention actually occurred. The trial court concluded that a *Terry* stop effectively occurred when Officer "Trani and [Appellee] caught each other's eye," because, in the court's view, that "could have given [Appellee] the impression that he was being approached with the obvious intention to detain and question him[.]" Trial Ct. Op., 1/19/17, at 5. Had a seizure occurred at that point in time, the court's decision to suppress was reasonable since the officers, by their own admission, had not yet observed Appellee engage in any suspicious activity.

Initially, we disagree with the trial court's determination that a seizure took place at the point when Officer Trani made eye contact with Appellee.

Neither the court nor Appellee has provided this Court with, nor is this Court aware of any, case law indicating that a seizure occurs when a police officer merely makes eye contact with a citizen. Thus, we reject the conclusion that eye contact with a police officer can, by itself, lead a reasonable person to believe that they are not free to leave the presence of the police.

Here, Appellee and Officer Trani made eye contact before Appellee started running, and Officer Trani was in uniform. Accordingly, Appellee was aware of the police's presence. *Cf. Washington*, 51 A.3d at 899. Officer Trani's testimony that the area in which Appellee was pursued was a high crime area was not challenged. Based upon the fact that Appellee was unprovoked and ran from police in a high crime area, Officer Trani had reasonable suspicion that criminal activity was afoot and was justified in pursuing Appellee. *See Jefferson*, 853 A.2d at 406. *Contra Taggart*, 997 A.2d at 1196. Further, while he was running, Appellant grabbed at his waistband and discarded a gun. Therefore, the gun Appellant abandoned during his flight should not have been suppressed, and the trial court's legal conclusion is not supported by the facts of record. Accordingly, we are compelled to reverse the trial court's suppression order. *See Hemingway*, 192 A.3d at 129.

Order reversed. Remanded for further proceedings. Jurisdiction relinquished.

P.J.E., Stevens joins the memorandum.

P.J.E., Bender files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/8/19