J-A03039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEENAN ALLEN | : | No. 947 EDA 2021 |

Appeal from the Order Entered April 13, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000503-2020

BEFORE: STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:               **FILED MAY 25, 2022**

The Commonwealth appeals from the order entered in the Philadelphia County Court of Common Pleas granting the pretrial motion to suppress filed by Keenan Allen (Appellee).[1] The trial court suppressed a firearm Appellee purportedly abandoned during a police pursuit. On appeal, the Commonwealth contends the trial court's factual findings are not supported by the record, and the police officer had reasonable suspicion to pursue Appellee as a shooting suspect, thus, his abandonment of the firearm was not

---

[1] The Commonwealth certified in its notice of appeal that the trial court's order "terminates or substantially handicaps the prosecution" pursuant to Pa.R.A.P. 311(d). **See** Commonwealth's Notice of Appeal, 5/9/21; Pa.R.A.P. 311(d) (permitting the Commonwealth to file interlocutory appeal as of right in a criminal case from an order "that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

coerced. For the reasons below, we reverse the order granting suppression of the firearm, and remand for further proceedings.

The instant appeal arises from a police investigation of shots fired during the early morning hours of November 27, 2019, in the City of Philadelphia. Appellee was subsequently arrested following a police chase, during which he purportedly abandoned a firearm. He was charged with three violations of the Uniform Firearms Act and fleeing or attempting to elude a police officer.[2] On July 24, 2020, Appellee filed a pretrial suppression motion, asserting his warrantless arrest was illegal. The trial court conducted a suppression hearing on April 13, 2021, at which the only witness — Philadelphia Police Officer Haralambos Athanasiadis — provided the following testimony.

On November 27, 2019, at approximately 2:30 a.m., Officer Athanasiadis was participating in an unrelated car stop with another officer at 40th and Brown Streets in Philadelphia, when he heard "about seven gunshots go off southbound of 40th Street." N.T. 4/13/21, at 5-6. The uniformed officer immediately got into his marked patrol SUV and drove, in the direction of the gunshots, southbound on 40th Street towards Fairmount Avenue. *Id.* at 6-7. As he was doing so, he heard 10 to 15 more gunshots. *Id.* at 13. The police vehicle's lights were flashing, but the siren was not activated. *Id.* at 27-28.

---

[2] ***See*** 18 Pa.C.S. §§ 6105(a), 6106(a)(1), 6108; 75 Pa.C.S. § 3733(a).

When he arrived in the area of 40th Street and Fairmount Avenue, Officer Athanasiadis encountered a man who was out of breath and running away from the sound of the gunshots. N.T. at 7, 21. He asked the man to "lift up his shirt," and the man complied. *Id.* at 21. When the officer asked him where the gunshots were coming from, the man replied he did not know, but "he pointed directly behind him towards Preston and Fairmount." *Id.* at 7-8. At that time, Officer Athanasiadis "noticed there was a vehicle in the middle of the street" about half a block away, and he saw Appellee running towards him. *Id.* at 8. The officer described what he observed as follows:

> [Appellee] had a stiff arm like [he was] holding his waistband bottom hoodie area. And [he] ran directly towards the vehicle and jumped [in] after making eye-contact with me.

*Id.* Officer Athanasiadis — who had been on the force for less than a year — explained that while he had only participated in two previous firearm investigations, he received training at the police academy that "the stiff arm . . . over the hoodie in the waistband area" indicated a suspect was "possibly armed." *Id.* at 12-13. The officer acknowledged that he could not see "if there was a heavy object in that hoodie[.]" *Id.* at 24.

After entering the vehicle, Appellee "immediately took off" westbound on Olive Street at a high rate of speed, and failed to stop at the stop sign on the corner. *See* N.T. at 9-10, 25. "Not even a second" later, Officer Athanasiadis proceeded to follow him. *Id.* at 9-10. Appellee eventually "lost control and crashed" his vehicle on the front lawn of the corner house at 46th and Aspen Streets. *Id.* at 9, 13. Appellee then exited the vehicle and fled

down a back alley on foot.  *Id.* at 13.  As Officer Athanasiadis gave chase, he observed Appellee reach his "[r]ight hand toward his hoodie area" and discard an object.  *Id.* at 14.  The officer stated he "heard a metal object hit the ground which [he] believed to be a firearm."  *Id.* at 15.  Shortly thereafter, Officer Athanasiadis apprehended Appellee, and then retrieved the firearm from the "back alley" where Appellee had discarded it.  *Id.* at 15, 19.

The entire incident — from the time Officer Athanasiadis left the initial car stop to his apprehension of Appellee — was recorded on the officer's body camera and lasted approximately three minutes.  N.T. at 17-18, 27.  The body camera video was played for the trial court during the suppression hearing.  *See id.* at 17-18.

Following argument by both Appellee's counsel and the Commonwealth, the trial court granted the motion to suppress.  *See* N.T. at 38; Order, 4/13/21.  This timely appeal by the Commonwealth followed.

On May 13, 2021, the trial court entered an order directing the Commonwealth to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal within 21 days, or by June 3rd.  On June 4, 2021, the Commonwealth filed a *nunc pro tunc* petition for a one-day extension of time, and attached a Rule 1925(b) statement.  In its petition, the Commonwealth averred the following:  (1) "through an inadvertent clerical error, it misplaced [the court's] order and failed to file the statement by June 3[;]" and, additionally, (2) the "undersigned attorney experienced the sudden death of a close family member a week ago and ha[d] been out of the office

attending to funeral arrangements since the end of last week." Commonwealth's Nunc Pro Tunc Petition for One-Day Extension to File Pa.R.A.P. 1925(b) Statement & to Accept Attached Statement as Timely Filed, 6/4/21. The trial court did not rule on the Commonwealth's petition for an extension of time. Rather, on July 8, 2021, the court filed an opinion addressing the merits of the Commonwealth's underlying claim. However, in a two-sentence statement at the conclusion of its opinion, the court noted that "[alt]hough [it] has answered Commonwealth's issues[,]" it was "clear" the Rule 1925(b) statement was untimely filed, and, thus, the issues are waived. Trial Ct. Op., 7/8/21, at 19.

The Commonwealth raises the following two, related issues on appeal:

1) Should this Court reject the [trial] court's factual finding that [Appellee] fled because an officer was pursuing him at high speed where the record contains no support for the court's assertion?

2) Did the [trial] court err as a matter of law by ruling that the police lacked reasonable suspicion under the totality of the circumstances to pursue [Appellee] after he ran from an area where two bursts of gunshots had just been fired; a police officer investigating the gunshots saw [Appellee] rigidly clutching his hoodie's waistband as he ran in a manner that . . . led the trained officer to believe that [Appellee] has a gun; and [Appellee] "jumped" into his car and drove away at a high speed through a stop sign immediately after making eye contact with the officer?

Commonwealth's Brief at 4.

Before we address the Commonwealth's substantive claims on appeal, we must first consider the Commonwealth's untimely filing of its Rule 1925(b) statement. We recognize that the Pennsylvania Supreme Court has

- 5 -

consistently reaffirmed its ruling first announced in ***Commonwealth v. Lord***, 719 A.2d 306 (Pa. 1998): "[I]n order to preserve their claims for appellate review, [a]ppellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925. Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived." ***Commonwealth v. Castillo***, 888 A.2d 775, 780 (Pa. 2005), *citing* ***Lord***, 719 A.2d at 309. The Court has also applied strict waiver when a statement is untimely filed. ***See Castillo***, ***supra***.

However, the 2007 amendments to Rule 1925 provided for an exception to the strict timeliness requirements. Paragraph (b)(2)(i) provides, in relevant part: "Upon application of the appellant and for good cause shown, the judge may enlarge the time period initially specified or permit an amended or supplemental Statement to be filed." Pa.R.A.P. 1925(b)(2)(i). The Rule also permits the court to allow for the filing of an amended or supplemental statement *nunc pro tunc* "[i]n extraordinary circumstances." ***Id.***

Here, the Commonwealth acknowledged that its Rule 1925(b) statement was one day late. However, it also provided "good cause" in its concomitant request for an extension of time. ***See*** Pa.R.A.P. 1925(b)(2)(i). Thus, we decline to find waiver.[3]

---

[3] We note, too, that a trial court is not required to order a Rule 1925(b) statement. ***See*** Pa.R.A.P. 1925(b) ("If the judge entering the order giving rise to the notice of appeal . . . desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of
*(Footnote Continued Next Page)*

Although the Commonwealth raises two distinct issues on appeal, they are related, and both concern the trial court's ruling granting suppression of the firearm abandoned by Appellee. Thus, we will address them together.

Our review of an order granting a motion to suppress evidence is well-established:

> We review trial court suppression orders to determine whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. **We are bound by the suppression court's factual findings so long as they are supported by the record**. In reviewing an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the [defendant's] witnesses along with the Commonwealth's evidence which remains uncontroverted. Our scope of review of suppression court factual findings is limited to the suppression hearing record. We, however, are not bound by a suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary.

***Commonwealth v. Barr***, 266 A.3d 25, 39 (Pa. 2021) (citations and quotation marks omitted; emphasis added). Moreover, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony." ***Commonwealth v. Elmobdy***, 823 A.2d 180, 183 (Pa. Super. 2003) (citation omitted).

---

record in the trial court and serve on the judge a concise statement of the errors complained of on appeal[.]"). Indeed, the purpose of the Rule is "to insure trial judges . . . the opportunity to opine upon the issues which the appellant intends to raise, and thus provide appellate courts with records amendable to meaningful appellate review." ***Castillo***, 888 A.2d at 779. Here, however, the only issue that the Commonwealth **could** raise on appeal was whether Officer Athanasiadis had reasonable suspicion to pursue Appellee.

The primary issue in this appeal is whether Appellee's abandonment of the firearm during the pursuit by Officer Athanasiadis was coerced. It is axiomatic that a defendant has no "standing to complain of a search or seizure of property that he has voluntarily abandoned." *Commonwealth v. Shoatz*, 366 A.2d 1216, 1220 (Pa. 1976). *See Commonwealth v. Pizarro*, 723 A.2d 675, 679 (Pa. Super. 1998) ("A criminal defendant has no privacy expectation in property that he has voluntarily abandoned or relinquished."). However,

> [a]lthough abandoned property may normally be obtained and used for evidentiary purposes by the police, **such property may not be utilized where the abandonment is coerced by unlawful police action**.

*Shoatz*, 366 A.2d at 1220 (emphasis added). Thus, property abandoned by a defendant following an "improper or unlawful act" by the police is inadmissible. *Commonwealth v. Byrd*, 987 A.2d 786 (Pa. Super. 2009) ("No improper or unlawful act can be committed by the officer **prior** to the evidence being abandoned [or relinquished]."), *citing Pizarro*, 723 A.2d at 679. Furthermore, in *Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996), our Supreme Court held that, under Article 1, Section 8 of the Pennsylvania Constitution, "a police officer's pursuit of a person fleeing the officer was a seizure" and therefore, "any contraband discarded during the pursuit was abandoned by coercion" unless the officer had the requisite reasonable suspicion to stop or probable cause to arrest the fleeing suspect. *Commonwealth v. Cook*, 735 A.2d 673, 675 (Pa. 1999), *citing Matos*, 672 A.2d at 771. Accordingly, as we will discuss *infra*, the primary issue before us

is whether Officer Athanasiadis possessed the requisite reasonable suspicion that criminal activity was afoot to justify his pursuit of Appellee. With this background in mind, we turn to the Commonwealth's contentions on appeal.

The Commonwealth first argues the trial court based its ruling upon factual findings that are not supported by the record — namely, that Appellee was running from "a speeding patrol car SUV . . . headed for him at high speed with lights flashing" and that Officer Athanasiadis gave contradictory testimony concerning where he first saw Appellee. Commonwealth's Brief at 15, 17, 21. Moreover, the Commonwealth insists that, based on the totality of the circumstances, Officer Athanasiadis had reasonable suspicion to pursue Appellee when: (1) the officer observed Appellee running from the area where he heard shots fired; (2) Appellee had a stiff arm holding the waistband area of his hoodie, which the officer's training taught him might be an attempt to conceal a weapon; (3) Appellee made eye contact with the officer before immediately jumping in a vehicle parked in the middle of the street; and (4) Appellee fled at a high rate of speed, ignoring a stop sign. **See id.** at 27. Because the officer's pursuit of Appellee was lawful, the Commonwealth contends Appellee "was not entitled to the suppression of the gun he voluntarily discarded during that pursuit." **Id.** at 28.

A detailed review of the trial court's comments during the suppression hearing, as well as the underlying basis for its decision in its Rule 1925(a) opinion, is necessary to our analysis. Following the testimony of Officer Athanasiadis, who was also questioned by the trial court, both counsel for

Appellee and the Commonwealth argued their respective positions. The Commonwealth maintained — as it does now on appeal — that Appellee's rigid hand on his waistband, while running from the direction of where shots had been fired, coupled with his flight in a high crime area, provided the officer with reasonable suspicion to stop and investigate him. *See* N.T. at 34-35. The court questioned, however, whether "[h]aving your hand on[ ] your waistband is . . . illegal[?]" to which the Commonwealth aptly responded, "No. That is not a crime." *Id.* at 35-36. The following discussion then took place:

> THE COURT:  Do you know whether or not he was running from a gunshot or something?  Do we have any evidence of what he was doing?  What his circumstances were?
>
> Do we have any information as to what [Appellee's] circumstances [were]?  Whether of not he may have been in danger?  Whether or not he was running from gun fire? . . .
>
> \*    \*    \*
>
> . . . **Does the officer know why [Appellee] was running besides the fact that a speeding patrol car SUV is headed for him at a high speed with lights flashing?**  Do we know what he was running from?
>
> \*    \*    \*
>
> No.  The answer is no.
>
> [Assistant District Attorney]:  What we did see in the video is when this officer was talking to that first guy.  That car was not moving.
>
> THE COURT:  A second later he's zooming at him.  I watched the video.
>
> [Assistant District Attoreny]:  And [Appellee] zoomed off.
>
> THE COURT:  They all zoomed.

> It's like you know he sees me. I see him. We're all moving.
>
> . . .
>
> But here is the deal [the officer had] to make a split-second decision to see whether or not a crime is afoot. And he says because the guy ran is why I chased him.
>
> Well, as far as the Court is concerned unfortunately — and I'm not crediting this guy with anything right — but unfortunately you see a police officer he's zooming at you. I'm an old man.
>
> I can't run. But if I was a young guy I might run. I might run seeing a guy coming down at me in an SUV. And there's shots fired not knowing he could have been a shooter.
>
> He may not have been a shooter. But nothing at that point has given the officer any information that a crime is done or other than what we say guilty conscience[.] And then he zooms.

*Id.* at 36-37 (emphasis added). The court then granted Appellee's motion to suppress the firearm.

In its Rule 1925(a) opinion, the trial court provided the following reasons in support of its ruling. First, the court noted that Officer Athanasiadis had only been on the force for 11 months at the time of the stop, had participated in only two prior firearm investigations, and "had no idea where the gunshots were fired or who fired them." Trial Ct. Op. at 8. The court further noted that there was also another male and two females running in the "general area of the shooting" and no one identified Appellee as the shooter. *Id.*

Second, the trial court emphasized that Officer Athanasiadis did not observe Appellee "engage in any type of criminal activity and the only reason he stopped [Appellee] is because [Appellee] ran, holding his waistband with no visible object seen by the officer." Trial Ct. Op. at 8. The court also insisted that Officer Athanasiadis gave "two very different accounts of what he says

happened during the incident." *Id.* In the first account, the officer witnessed Appellee running toward the vehicle stopped in the middle of the street, while holding his waistband. *Id.* at 8-9. However, the court maintains the officer gave a second account, in which he saw Appellee simply "standing at his car then leaving the area in a vehicle." *Id.* at 9 (record citation omitted).

Third, the trial court opined that the Commonwealth failed to present any evidence that Appellee was the "actual shooter" — such as, whether the recovered gun was actually fired, whether any bullet casings from the shooting matched the recovered weapon, or whether Appellee had gunshot residue on his hands. Trial Ct. Op. at 9. The court summarized the evidence as follows:

> Using the totality of the circumstances, all Commonwealth presented was an officer, during a three minute encounter in total, who witnessed a panic of three individuals running from the scene and stopped a male to investigate whether that male was the shooter. It was not until after the male complied with the demands of the officer that the officer, who saw [Appellee] standing near a vehicle and had already left the area 15-20 seconds after his initial encounter with the male, decided to pursue him.
>
> Also, depending on which story is to be believed, the Commonwealth also presented evidence of [Appellee] who committed no crime but who, with three others, ran away from the scene holding his waistband after gunshots occurred in the general area. The court makes mention that there was no evidence to refute that [Appellee] may have been running away from danger himself. Further, [the] Commonwealth agreed with the court that simply holding your waistband is not illegal. Therefore, there is no evidence that [the] Commonwealth brought forth which shows that using the totality of the circumstances, Officer Athanasiadis had reasonable suspicion or probable cause to stop [Appellee]. Thus, the gun discarded by [Appellee] should be suppressed.

- 12 -

*Id.* at 9-10 (record citations omitted).

The trial court further rejected the Commonwealth's assertion that Appellee's unprovoked flight from a high-crime area was sufficient, itself, to justify the stop. *See* Trial Ct. Op. at 10-11. The court emphasized that Officer Athanasiadis — who characterized the neighborhood as "high-crime" — was new to the force and had little evidence to support his characterization. *See id.* at 11-12. Indeed, the trial court opined: "To simply rely on the words of an officer that a certain area within a city or county is high crime creates a very slippery slope that may lead into bias policing, racism, and classism." *Id.* at 14. Rather, the court suggested the Commonwealth should be required to prove an area is high-crime "through statistical data." *Id.* at 15.

Lastly, the trial court commented on the fact that "there is a legitimate reason why people of color, specifically black people, run from police, and that is fear." Trial Ct. Op. at 17. The court was particularly concerned by the fact that near the conclusion of the foot chase, Officer Athanasiadis yelled to Appellee, "I will shoot you." *Id. See* N.T. at 20. The court opined:

> There was no reason for the officer's words to even escalate to that point where he admittedly said that he did not see [Appellee] do anything criminal.
>
> So for the Court to rely on the word of an officer (who claimed that he would shoot [Appellee] and saw [Appellee] commit no criminal activity) without any type of statistical evidence to support [the] Commonwealth's argument that flight plus high crime is sufficient would be incredibly harmful to [Appellee]. . . . For the Court to ignore clear reasons why a black person may be provoked to run by police presence alone after the deaths of Mike Brown, Sandra Bland, Eric Garner, George Floyd, and many others would be incredibly tone deaf in a field that is

- 13 -

not very diverse itself. . . . It is time for the Court to clearly define what exactly is high crime and in what manner shall the Commonwealth prove, with data, that an area is high-crime. Because the Commonwealth leaning on a tone-deaf rule that says running from the police in a high-crime area, which is sometimes coded as black or poor, is enough to raise reasonable suspicion is clearly not working to protect every citizen from unreasonable searches and seizures.

Trial Ct. Op. at 17-19 (footnotes and emphasis omitted).

With this background in mind, we consider the Commonwealth's arguments on appeal. Initially, we agree with the Commonwealth that some of the trial court's factual findings are not supported by the record.[4] **See Barr**, 266 A.3d at 39 (appellate court is bound by suppression court's factual findings "so long as they are supported by the record").

As the Commonwealth points out, at the conclusion of the suppression hearing, the court implied that Appellee "was running because 'a speeding patrol car SUV [was] headed for him at high speed with lights flashing[.]" Commonwealth's Brief at 17, *citing* N.T. at 36. However, that scenario is not borne out in Officer Athanasiadis's testimony. The officer testified he was **not** approaching Appellee when he first saw him, but rather, was speaking to the other man when he observed Appellee running towards him and away from the area where the shots were fired. **See** N.T. at 8, 11, 28-29. Thus, to the

_____

[4] We highlight that, before issuing its ruling at the suppression hearing, the trial court did not "enter on the record a statement of findings of fact and conclusions of law" as required by Pa.R.Crim.P. 581(I). Nor did the court issue an opinion fulfilling the mandate of Rule 581(I) prior to the Commonwealth's appeal. Nevertheless, we are able to glean the court's factual findings from its Rule 1925(a) opinion and need not remand for specific findings.

extent the trial court found Appellee was running, initially, because the officer pursued him for no apparent reason, that determination is not supported by the record.

Furthermore, in its opinion, the trial court emphasizes the "fact" that Officer Athanasiadis "gave . . . two very different accounts of what he says happened during the incident." Trial Ct. Op. at 8. The court notes the officer first testified that, while investigating the other man, he observed Appellee running towards the vehicle parked in the middle of the street. *See id.* at 8-9. However, the court insists that the officer later testified he "did not see [Appellee] running to his car, but witnessed [Appellee] standing at his car then leaving the area in a vehicle." *Id.* at 9. In support of this "factual finding," the court cites to page 28 of the suppression hearing transcript. *See id.*

Again, we conclude the record does not support the court's finding. Indeed, it was the trial court that suggested Appellee was "standing at the car" when the officer first observed him. N.T. at 28. During its own questioning of Officer Athanasiadis, the court asked if the officer had his lights on as he approached the area where he heard gunshots. *Id.* The officer responded, "Yes" and the following exchange occurred:

> [THE COURT:] He's standing at the car? He's not in the car yet, right?
>
> [Officer Athanasiadis:] No. You can hear [on the body camera video] the screech when he jumped in the vehicle and accelerated off.
>
> [THE COURT:] But you're approaching him?

[Officer Athanasiadis:]  At that moment I was not approaching him.

[THE COURT:]  You were not approaching him?

[Officer Athanasiadis:]  No.  I was speaking to the [other] individual.  He jumped in the vehicle.  And that's when I took off after him.

N.T. at 28-29.  The court indicated it was confused and asked the officer to state when he saw Appellee, while the court played the body camera video. *See id.* at 29.  When the officer did so, the court asked:  "Are you telling me at this point you see [Appellee]?" *Id.*  Officer Athanasiadis responded:  "Yes.  **I saw him run to the vehicle**." *Id.* (emphasis added).  The court repeated the officer's testimony:  "You saw him run to the vehicle?" following which the officer replied, "Yes.  Your Honor." *Id.* at 29-30.

Accordingly, at no point did Officer Athanasiadis testify he saw Appellee simply **standing by** the vehicle stopped in the middle of the street.  Rather, he consistently testified that when he first observed Appellee, Appellee was running away from the direction of the gunshots, and towards the vehicle stopped in the middle of the street. *See* N.T. at 8-9, 11-12, 28-30.  Thus, to the extent the trial court determined Officer Athanasiadis provided two, contradictory accounts of the events prior to his pursuit of Appellee, we reject that finding as unsupported by the record. *See Barr*, 266 A.3d at 39.

Nevertheless, the more significant issue is whether Appellee's abandonment of the firearm was coerced — in other words, whether Officer Athanasiadis had reasonable suspicion to pursue and investigate Appellee.  If Appellee discarded the firearm as a result of unlawful police action, then we

must conclude the trial court properly suppressed the evidence. ***See Matos***, ***supra***. The relevant inquiry "is whether the police officers demonstrated reasonable suspicion at the time they recovered the contraband abandoned by" the suspect. ***Cook***, 735 A.2d at 675-76 (footnote omitted).

When determining whether an officer has reasonable suspicion to justify an investigatory stop, we must bear in mind the following:

> In order to justify an investigatory stop, the police must have, at its inception, a reasonable suspicion that criminal activity is afoot. The police must be able to point to specific and articulable facts which reasonably support that suspicion. Particularly, police must possess both suspicious conduct on the part of the persons so detained and a reasonable belief of some sort of criminal activity.
>
> **In determining whether a reasonable suspicion exists, we must look to the totality of the circumstances**. Merely because a suspect's activity may be consistent with innocent behavior does not alone make detention and limited investigation illegal. Rather, we view the circumstances through the eyes of a trained officer, not an ordinary citizen.

***Commonwealth v. Riley***, 715 A.2d 1131, 1135 (Pa. Super. 1998) (citations omitted and emphasis added).

This Court has stated that "[e]vasive behavior" and location in a "high crime area" are relevant considerations in determining whether an officer has reasonable suspicion to conduct an investigatory stop. ***Commonwealth v. Foglia***, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*). ***See also In re D.M.***, 781 A.2d 1161, 1164 (Pa. 2001) (explaining that "unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify [an investigatory] stop under the Fourth Amendment."). Moreover, "if a suspect

engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search of the location where the hand movements occurred." *Foglia*, 979 A.2d at 361.

Here, the relevant consideration is whether Officer Athanasiadis had reasonable suspicion to believe Appellee was engaged in criminal behavior **before** the officer pursued him. If not, we must conclude the firearm Appellee discarded was "abandoned by coercion." *Cook*, 735 A.2d at 675. As explained *supra*, the trial court found Officer Athanasiadis lacked the requisite reasonable suspicion to pursue Appellee. We conclude the court's ruling was erroneous for the following reasons.

First, as noted above, the court made factual findings that were not supported by the record. Thus, to the extent the trial court determined Officer Athanasiadis's testimony was undermined because he provided contradictory explanations of the events leading to his pursuit of Appellee, we conclude the court erred.

Second, the trial court improperly focused on the fact that no one identified Appellee as the shooter, and Officer Athanasiadis did not witness Appellee "engage in any type of criminal activity." Trial Ct. Op. at 8. Neither of these facts are relevant. That fact that no one identified Appellee is simply a consideration — but it did not preclude the officer from developing reasonable suspicion that Appellee was involved in criminal activity. Moreover, that fact that the officer did not witness a crime is also irrelevant.

"[E]ven in a case where one could say that the conduct of a person is **equally** consistent with innocent activity, the suppression court would not be foreclosed from concluding that reasonable suspicion nevertheless existed." *Commonwealth v. Carter*, 105 A.3d 765, 772 (Pa. Super. 2014) (*en banc*) (citation omitted).

Third, the court's focus on the lack of evidence that Appellee was the actual shooter is also misplaced. The Commonwealth is not required to prove the defendant is guilty of the underlying crime at a suppression hearing. Rather, "the Commonwealth bears the burden of proving that the police seized evidence without violating defendant's constitutional rights." *Commonwealth v. Frederick*, 124 A.3d 748, 755 (Pa. Super. 2015). Indeed, even if the Commonwealth had presented evidence that the recovered firearm was used in the shooting, and that Appellee had gunshot residue on his hands, the trial court would still have been required to suppress the firearm if Officer Athanasiadis had no reasonable suspicion to pursue Appellee. Absent reasonable suspicion for the seizure, Appellee's abandonment of the firearm would have been coerced. *See Cook*, 735 A.2d at 675. Thus, the trial court erred when it cited **the lack** of such evidence as a relevant consideration. Fourth, the trial court erred when it discounted Officer Athanasiadis's description of Appellee holding his waistband with a stiff arm while running as "not illegal." Trial Ct. Op. at 10. The court did not find the officer's testimony incredible, nor did it discredit his statement that he was trained to recognize this maneuver as a way to conceal a firearm. Rather, as noted above, the

court focused on the following: Officer Athanasiadis did not observe Appellee engage in criminal behavior, the officer could not see any object concealed in Appellee's waistband, "simply holding your waistband is not illegal[,]" and Appellee "may have been running away from danger himself." **See** Trial Ct. Op. at 8, 10. However, a police officer is not required to have witnessed a person actually committing a crime before initiating an investigatory stop. What is required is reasonable suspicion that criminal activity is afoot based upon the totality of the circumstances. **See Riley**, 715 A.2d at 1131. Probable cause to support an arrest is a distinctly different, and more stringent standard. **Commonwealth v. Rodriguez**, 585 A.2d 988, 990 (Pa. 1991) (probable cause to arrest satisfied when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime."). Here, it is evident the trial court, when determining whether Officer Athanasiadis had reasonable suspicion to conduct an investigatory stop, did not consider the **totality of the circumstances** at the time the officer decided to pursue Appellee.

Officer Athanasiadis consistently testified to the following sequence of events, which led him to suspect Appellee may be involved in criminal acitvity: (1) while participating in an unrelated traffic stop, he heard gunshots "go off southbound of 40th Street[;]" (2) he immediately drove in the direction of the gunshots and heard several more; (3) at 40th Street and Fairmount Avenue,

he encountered a man running away from the gunshots, who indicated the shots were coming from behind him;[5] (4) at that time, the officer observed Appellee running away from the direction of the gunshots; (5) Appellee had a "stiff arm" holding the waistband area of his hoodie; (6) the officer was trained to recognize this maneuver as a way to conceal a weapon; (7) Appellee looked at the officer (who was uniformed and in a marked SUV) and immediately jumped in a vehicle parked in the middle of the street; and (8) Appellee sped off, while failing to obey a stop sign. *See* N.T. at 5-10, 12-13, 25. It was at that point Officer Athanasiadis began to pursue Appellee. *Id.* at 9-10. Thus, the record supports a finding that Appellee's flight from the scene was not prompted by any action taken by Officer Athanasiadis. Rather, Appellee appeared on the scene running away from the area of the gunshots and holding his waistband in a suspicious manner. Appellee made eye contact with the officer and then, unprompted, jumped into a vehicle and fled at a high rate of speed, ignoring a stop sign. Thereafter, when Officer Athanasiadis pursued him, Appellee did not stop until he crashed his vehicle. He then fled the scene on foot. It was during that final pursuit that Appellee discarded his firearm. Under these circumstances, Appellee's abandonment of the firearm was not coerced by any improper police action.

---

[5] The trial court also ignores the fact that Officer Athanasiadis asked the first man to "lift up his shirt[,]" which, presumably, cleared the man as a suspect in the shooting before the officer pursued Appellee. *See* N.T. at 21.

Therefore, we conclude that, under the totality of the circumstances, Officer Athanasiadis had reasonable suspicion to believe Appellee was involved in criminal activity. *See Riley*, 715 A.2d at 1135. Rather than consider the totality of the circumstances, the trial court focused on each, individual action and concluded none were indicative of criminal behavior. However,

> the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, [e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004) (citation and quotation marks omitted). *See also Commonwealth v. Raglin*, 178 A.3d 868, 873 (Pa. Super. 2018) (concluding totality of circumstances — gunshot sensor alerted shots fired in high crime area, defendant was in close proximity to identified area, and defendant engaged in evasive behavior when police arrived — was sufficient to establish reasonable suspicion that defendant was involved in possible shooting).[6]

_____

[6] Appellee's reliance on *Commonwealth v. Martinez*, 588 A.2d 513 (Pa. Super. 1991), is unavailing. *See* Appellee's Brief at 5-6. In *Martinez*, uniformed police officers in an unmarked vehicle on patrol at 12:20 a.m., noticed several people, including the defendant, standing on a corner. *Martinez*, 588 A.2d at 515. The group "looked in the direction of the approaching police vehicle" and began to disperse. *Id.* The defendant walked away "very quickly." *Id.* The officers then began to pursue the defendant. *Id.* As they did so, they notice she was "holding her hands in front of her coat, leaning forward, as if to be holding something[.]" *Id.* (record citation omitted). The officers directed her to put her hands on their car, and as she did, a bag of contraband dropped to the ground. *Id.*

*(Footnote Continued Next Page)*

Lastly, we agree with the Commonwealth's assertion that, under the facts presented here, the "level of crime in the shooting neighborhood is irrelevant." Commonwealth's Brief at 32. Indeed, the court devotes a significant portion of its opinion to question the propriety of existing case law which permits a finding of reasonable suspicion based solely on unprovoked flight in a high-crime area. *See* Trial Ct. Op. at 10-19. The court further questioned Officer Athanasiadis's characterization of the area of the shooting as "high crime," when he had been on the force less than a year and testified "the shootings only happened two times a week." *Id.* at 11. The trial court commented that the Commonwealth was "solely leaning on [these] fact[s]" in support of its argument that the officer had reasonable suspicion. *Id.*

Again, we disagree. Although Officer Athanasiadis did characterize the area of the shooting as "high crime," that description was not necessary to the reasonable suspicion analysis in the present case. Indeed, when asked

---

This Court concluded "there was no basis [for the officers] to reasonably believe that [the defendant] hand engaged in any unusual and suspicious conduct." *Martinez*, 588 A.2d at 517. Rather, the only "articulable facts attributed to" the defendant, were that she "had walked away quick from a street corner, at 12:20 A.M.[, and s]he was holding her hands in the front of her coat[.]" *Id.* at 516. Further, the officers did not notice a "bulge" in her coat until **after** they began pursuing her. *Id.*

Conversely, here, Officer Athanasiadis observed Appellee running away from gunshots, with his arm held in a position that the officer's training taught him might conceal a weapon. Moreover, Appellee looked at the officer, and then fled at a high rate of speed in a vehicle stopped in the middle of the street. It was at that point the officer pursed Appellee. Thus, the facts presented *sub judice* are clearly distinguishable from *Martinez*.

why he "[i]mmediately . . . thought that [Appellee] was a possible shooter[,]" the officer replied:

> It was like a panic from the hand holding the hoodie area as he was running towards the vehicle to his jumping[ in]. And then as soon as I got behind him he didn't stop either.

N.T. at 30. Thus, in our view, the facts presented were sufficient to support reasonable suspicion without consideration of whether or not the incident occurred in a "high crime" neighborhood.[7]

Consequently, because we conclude the trial court erred in when it found Officer Athanasiadis did not have reasonable suspicion to pursue Appellee and that his subsequent abandonment of the firearm was coerced, we reverse the order granting Appellee's motion to suppress and remand for further proceedings.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

---

[7] Accordingly, the trial court's call for objective, statistical data proving a neighborhood is "high crime" is best left for another case. We note, however, that the court's concern can be alleviated by its own questioning of the officer at the suppression hearing. As noted **_supra_**, a trial court sits as fact finder during a suppression hearing and, thus, determines the credibility of the witnesses who appear before it. **_See Elmobdy_**, 823 A.2d at 183. Accordingly, a suppression court would be in the best position to consider an officer's rationale for characterizing a particular neighborhood as "high crime."

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/25/2022</u>